1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

NORTHERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| BEHRING REGIONAL CENTER LLC, | Case No.  20-cv-09263-JSC |
| Plaintiff, | |
| v. | **ORDER GRANTING SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR ON CLAIM FOUR** |
| CHAD WOLF, et al., | |
| Defendants. | |

Behring Regional Center, LLC, a California-based Regional Center that sponsors capital investment projects using funds from foreign investors who are EB-5 Immigrant Investor Program applicants, brings this Administrative Procedures Act ("APA") action against the Department of Homeland Security.[1]  Plaintiff contends that Homeland Security violated the APA when it promulgated a final rule in July 2019 amending its regulations for the EB-5 Program ("the Final Rule").

At the hearing on Plaintiff's motion for a preliminary injunction, the parties agreed to convert Plaintiff's motion to summary judgment on its fourth claim—that the Final Rule was promulgated "in excess of statutory authority" because Former Acting Homeland Security Secretary Kevin McAleenan was not properly serving in his position when he promulgated the Final Rule in July 2019.  *See* 5 U.S.C. §§ 706(2)(A), 706(2)(C), 706(2)(D).  (Dkt. No. 32.[2])

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 8, 16.)
[2] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

United States District Court
Northern District of California

1   Following the hearing, the current Secretary of Homeland Security, Alejandro Mayorkas, ratified

2   the Final Rule.  (Dkt. No. 34-1.)  The government argues that this cures any defect in Mr.

3   McAleenan's promulgation of the Final Rule.  Having considered the parties' arguments and the

4   relevant legal authority, and having had the benefit of oral argument on May 13, 2021, the Court

5   GRANTS summary judgment in Plaintiff's favor on its Fourth Claim for Relief.  McAleenan was

6   not lawfully serving as Homeland Security Secretary when he promulgated the Final Rule, and

7   therefore, under the Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345 et seq., the

8   Final Rule is void.  Further, neither Secretary Mayorkas's after-the-fact ratification nor the de-

9   facto officer doctrine save the Rule.

10                                       **BACKGROUND**

11   **A.  The Appointments Clause and Federal Vacancies Reform Act**

12        Under the Appointments Clause, the President is granted the power to nominate Officers of

13   the United States, such as Homeland Security Secretary.  U.S. Const., Art. II, § 2, cl.2.  That

14   power is counterbalanced by "[t]he Senate's advice and consent power ... a critical structural

15   safeguard of the constitutional scheme."  *N.L.R.B. v. SW Gen., Inc.*, — U.S. —, 137 S.Ct. 929, 935

16   (2017) ("*SW Gen. II*") (internal quotations, alterations and citations omitted).  However, because

17   the constitutional process of Presidential appointment and Senate confirmation can take time, "the

18   responsibilities of an office requiring Presidential appointment and Senate confirmation—known

19   as a 'PAS' office—may go unperformed if a vacancy arises and the President and Senate cannot

20   promptly agree on a replacement."  *SW Gen., II*, 137 S.Ct. at 934.  Recognizing this reality,

21   Congress has "authoriz[ed] the President to direct certain officials to temporarily carry out the

22   duties of a vacant PAS office in an acting capacity, without Senate confirmation."  *Id*.  The FVRA

23   "is the latest version of that authorization."  *Id*.  The FVRA sets forth the exclusive means of

24   temporarily filling vacancies in PAS offices.  *See Guedes v. Bureau of Alcohol, Tobacco,*

25   *Firearms & Explosives*, 920 F.3d 1, 12 (D.C. Cir. 2019), *judgment entered*, 762 F. App'x 7 (D.C.

26   Cir. 2019), *and cert. denied*, 140 S. Ct. 789 (2020).

27        Under Section 3345(a) of the FVRA, the general rule is that the first assistant to a vacant

28   office shall become the acting officer, "[b]ut there is an 'unless'—Congress crafted exceptions to

2

that exclusivity." *Guedes*, 920 F.3d at 11; 5 U.S.C. § 3347(a)(1)(A)-(B) ("unless – ... a statutory provision expressly – ... authorizes the ... head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or ... designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."). The Homeland Security Act provides such an exception here; namely, that the Deputy Secretary "shall be the Secretary's first assistant for purposes of" the FVRA, thereby expressly incorporating the "first assistant" language used in the FVRA. Pub. L. No. 107-296, § 103, 116 Stat. 2135, 2144 (2002) (codified at 6 U.S.C. § 113(a)(1)(A)).

On December 23, 2016, Congress amended the Homeland Security Act in two relevant ways. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000, 2672 (2016). First, the amendment established that the Under Secretary for Management would "serve as the Acting Secretary if by reason of absence, disability or vacancy in office, neither the Secretary nor the Deputy Secretary is available to exercise the duties of the Office of Secretary." 6 U.S.C. § 113(g)(1). Second, the Secretary has the authority, notwithstanding the FVRA, to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).

As relevant here, the last Senate-confirmed Homeland Security Secretary under the Trump administration, Kirstjen Nielsen, resigned on April 10, 2019. Prior to her resignation, Secretary Nielsen purportedly amended the Order of Succession for Homeland Security Secretary to move the Commissioner of Customs and Border Protection from 14th to third in line for succession to assume the position of Acting Secretary after Deputy Secretary and Under Secretary for Management. *See* Department of Homeland Security Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions* § II.B (Apr. 10, 2019); (Dkt. No. 21-2). However, Secretary Nielsen's amendment dealt exclusively with temporary vacancies occurring when the Secretary is "unavailable to act during a disaster or catastrophic emergency," not following a resignation. *Id.* In particular, Secretary Nielsen amended Delegation No. 00106, Annex A, which identifies those with authority to act in the event

3

of the Secretary's "unavailab[ility] to act during a disaster or catastrophic emergency", rather than Executive Order 13753, 81 Fed. Reg. 90667 (Dec. 9, 2016), which sets forth the "orderly succession of officials" following "the Secretary's death, resignation, or inability to perform." *See La Clinica de la Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 6940934, at *13 (N.D. Cal. Nov. 25, 2020) (discussing the orders of succession and delegation in detail).

Under Secretary Nielsen's amendment to the Order of Succession, Kevin McAleenan, who was serving as the Customs and Border Protection Commissioner at the time, purportedly became the Acting Secretary of Homeland Security upon Secretary Nielsen's resignation because the offices of Deputy Secretary and Under Secretary for Management were both vacant. Six months later, McAleenan resigned, and in November 2019, on his way out of office, he purported to again amend the Order of Succession to move the Under Secretary for Strategy, Policy, and Plans up to fourth in line on the Homeland Security succession list behind the Commissioner of Customs and Border Protection. On November 13, 2019, the Senate confirmed Chad Wolf as the Under Secretary for Strategy, Policy, and Plans, and because all three positions ahead of him in the Homeland Security Order of Succession signed by Mr. Kevin McAleenan were vacate, he became the Acting Secretary of Homeland Security.

### B. The EB-5 Program

The EB-5 Immigrant Investor Program was established as part of the Immigration and Nationality Act ("INA") of 1990. *See* Pub. L. No. 101-649, § 121(a) (Nov. 29, 1990) (codified at 8 U.S.C. § 1153(b)(5)). The Program offers foreign nationals the opportunity to obtain a visa when they invest money in American businesses that create at least ten American jobs. *See* 8 U.S.C. § 1153(b)(5). The statute specifies that "the amount of capital required" to obtain such a visa is $1,000,000, but notes that the Secretary of Homeland Security "may from time to time prescribe regulations increasing the dollar amount specified." *Id*. § 1153(b)(5)(C)(i). If investors make investments in "targeted employment areas," the threshold amount of capital required is lowered to $500,000. *Id*. § 1153(b)(5)(C)(ii). A targeted employment area (TEA) subject to the reduced threshold may be either "an area which has experienced high unemployment (of at least 150 percent of the national average rate)" or a "rural area," which is "any area other than an area

within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more." *Id*. § 1153(b)(5)(B)(ii)–(iii).  The Act allocates 9,940 immigrant visas each fiscal year to foreign nationals participating in the EB-5 program, and at least 3,000 of the visas must be reserved for persons investing in TEAs.  *See* 8 U.S.C. §§ 1151(d), 1153(b)(5)(B)(i).

In 1992, Congress expanded the EB-5 program by establishing the regional center "pilot program," which authorized "regional center[s] in the United States … for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, or increased domestic capital investment."  *See* Departments of State, Justice, and Commerce, the Judiciary and Related Agencies Appropriations Act of 1992, Pub. L. No. 102-395, § 610(a) (Oct. 6, 1992) (codified at 8 U.S.C. § 1153).  Congress has authorized United States Citizenship and Immigration Services to give priority to EB-5 petitions filed through the Regional Center Program.  *See* Pub. L. No. 102-395, § 601(d), *amended by* Pub. L. No. 112-176, § 1 (Sept. 28, 2012).

**C.  The 2019 Final Rule**

Until 2017, Homeland Security maintained the standard EB-5 investment threshold at $1 million and the reduced investment threshold at $500,000, as originally set by the INA in 1990.  *See* 8 C.F.R. § 204.6(f) (2018).  On July 21, 2019, then-Acting Homeland Security Secretary McAleenan signed a Final Rule, which, among other things, increased the standard investment threshold to $1.8 million and the reduced investment threshold to $900,000.  EB-5 Immigrant Investor Program Modernization, 84 Fed. Reg. 35,750, 2019 WL 3302698 (July 24, 2019).  The United States Citizenship and Immigration Services, through its Acting Director Ken Cuccinelli, issued the Final Rule on July 24, 2019.  When the Final Rule went into effect on November 21, 2019, Chad Wolf was serving as the Acting Homeland Security Secretary.

**D.  This Lawsuit**

Plaintiff, an EB-5 regional center, filed this APA lawsuit on December 21, 2020. (Complaint, Dkt. No. 1.)  It alleges that the Final Rule has had "devasting effects on the Program's participants and the ability to raise capital for job creating development projects."  (*Id*. at ¶ 58.)

Plaintiff brings four claims under the APA: (1) the Final Rule is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A); (2) the Department of Homeland Security failed to properly perform an economic impact analysis under the Regulatory Flexibility Act in violation of 5 U.S.C. § 601; (3) the Department of Homeland Security exceeded its statutory authority to designate TEAs in violation of 5 U.S.C. § 706(2)(C); and (4) Defendants lacked authority to promulgate the Final Rule in violation of 5 U.S.C. §§ 706(2)(A), (C), 7-7(2)(D).

Two days after Plaintiff filed the complaint, it moved for a preliminary injunction.  (Dkt. No. 10.)  A month later, before briefing on that motion was complete, Defendants moved to transfer the action to the U.S. District Court for the District of Columbia where a similar action is pending, *Florida EB5 Inv., LLC v. Wolf et al.*, Case 1:19-cv-03573-RJL (D.D.C. filed Nov. 26, 2019).  (Dkt. No. 18.)  The Court heard argument regarding both motions on March 25, 2021.  The Court subsequently denied Defendants' motion to transfer, and, after giving the parties notice, converted Plaintiff's motion for preliminary injunction in part into a motion for summary judgment on Plaintiff's fourth claim for relief: that Defendants lacked authority to promulgate the Final Rule in violation of 5 U.S.C. §§ 706(2)(A), (C), 7-7(2)(D).  (Dkt. No. 32.)  On March 31, 2021, the recently-Senate confirmed Secretary of Homeland Security Alejandro Mayorkas purported to ratify the Final Rule.[3]  (Dkt. No. 34.)  The parties filed supplemental submissions (Dkt Nos. 35, 37, 38, 39, 43) and the Court heard further argument on May 13, 2021.

## DISCUSSION

The issue presented is whether the Final Rule must be set aside as contrary to law because neither Mr. McAleenan, Mr. Wolf, nor Mr. Cuccinelli was lawfully serving in his role at the time the Final Rule issued.  In particular, Plaintiff insists that because Secretary Nielsen amended the wrong succession order, her amendment appointing Mr. McAleenan to Acting Secretary did not have the force of law, and Mr. McAleenan's appointment of Mr. Wolf as his successor likewise lacked the force of law.  Similarly, because Congress never authorized the establishment of the newly-created position "Principal Deputy Director of USCIS", Mr. Cuccinelli's appointment to

---

[3] Secretary Mayorkas was confirmed on February 2, 2021.

1   that position was also invalid.  For purposes of the current motion for summary judgment, the

2   focus is on Mr. McAleenan's appointment.

3         Plaintiff's claim arises under the FVRA and the Homeland Security Act.  The FVRA

4   "authorizes the President, a court, or the head of an Executive department, to designate an officer

5   or employee to perform the functions and duties of a specified office temporarily in an acting

6   capacity."  5 U.S.C. §3347(a)(1)(A).  The Homeland Security Act, consistent with the FVRA,

7   states that the "Secretary" may designate an order of succession and does not expressly vest that

8   power in an "Acting Secretary."  Under the FVRA's vacant-office provision, if a person is not

9   lawfully serving in conformity with the FVRA, "[a]n action taken" by that person "in the

10   performance of any function or duty of [the] vacant office ... shall have no force or effect" and

11   "may not be ratified." 5 U.S.C. § 3348(d)(1)–(2) (emphasis added); *but cf. id.* § 3348(e)

12   (exempting certain offices not at issue here).

13         Resolution of Plaintiff's claim turns on two initial questions: (1) was Mr. McAleenan

14   lawfully serving in conformity with the FVRA, and (2) if not, whether the power to prescribe a

15   regulation that changes the investment amount for the EB-5 Program is an action taken in

16   performance of a function or duty of the vacant office in violation of the FVRA.

**A. McAleenan's Appointment was Invalid**

18         This Court joins the numerous other courts which have held that because Secretary Nielsen

19   amended the wrong Order of Succession when she purported to place the Customs and Border

20   Protection Commissioner—Mr. McAllenan—third in line after the Deputy Secretary of Homeland

21   Security and the Under Secretary of Management for succession to the Acting Secretary of

22   Homeland Security position, Mr. McAllenan's appointment was invalid.  *See, e.g.*, *La Clinica de*

23   *la Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 7053313, at *7 (N.D. Cal. Nov. 25, 2020)

24   ("former Secretary Nielsen's April 9th order did not alter the Department's order of succession in

25   cases of resignation and that Executive Order 13753 continued to govern the order of succession at

26   the time of Secretary Nielsen's resignation."); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 132

27   (E.D.N.Y. 2020) ("Based on the plain text of the operative order of succession, neither Mr.

28   McAleenan nor, in turn, Mr. Wolf, possessed statutory authority to serve as Acting Secretary.");

United States District Court
Northern District of California

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 960 (D. Md. 2020), *appeal dismissed sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 20-2217 (L), 2021 WL 1923045 (4th Cir. Mar. 23, 2021) ("McAleenan's appointment was invalid under the agency's applicable order of succession, and so he lacked the authority to amend the order of succession to ensure Wolf's installation as Acting Secretary."); *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-CV-09253-JD, 2021 WL 75756, at *5 (N.D. Cal. Jan. 8, 2021) ("Because the passing of the torch from Nielsen to McAleenan was ineffective, the attempt by McAleenan to pass it in turn to Wolf had no legal effect whatsoever. The entire succession argument under the HSA consequently falls apart.")

The Government Accountability Office ("GAO") has reached a similar conclusion. GAO, Homeland Security, File B-331650, (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf. In its August 2020 decision, the GAO concluded that although "Mr. McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen, [] the express terms of the existing designation required another official to assume that title. As such, Mr. McAleenan did not have the authority to amend the Secretary's existing designation." *Id*. at 10.

Accordingly, at the time the Final Rule was approved, Mr. McAleenan was not properly serving as the Acting Secretary of Homeland Security.

**B. Promulgating the Rule Violated the FVRA**

The Court thus turns to the second question, whether given Mr. McAleenan's unlawful appointment, promulgating the regulation to change the investment amount was an action taken in performance of a function or duty of the vacant office. The government's argument here is three-fold. First, that the EB-5 statute does not say that "only" the Secretary can change the investment amount. Second, that unless a duty is explicitly non-delegable, it is delegable in accordance with the "Homeland Security Act [and] the longstanding presumption of delegability." Third, even if specific non-delegability is not required, the Secretary nonetheless did delegate the authority here. None of these arguments are availing.

**1) Section 1153 Falls Under the FVRA**

The EB-5 Program was established as part of the Immigration Act of 1990. It is codified at 8 U.S.C. § 1153 which generally governs allocation of immigrant visas. To be considered for

1   permanent residency under the EB-5 Program, a foreign investor must invest at least $1 million in

2   a new commercial enterprise in the United States that will create at least 10 full-time jobs for

3   United States citizens or legal aliens.  *See* 8 U.S.C. § 1153(b)(5).  The statute states that with

4   respect to the amount of capital required for an investment in the EB-5 Program: "[t]he Attorney

5   General, in consultation with the Secretary of Labor and the Secretary of State, may from time to

6   time prescribe regulations increasing the dollar amount specified under the previous sentence."  8

7   U.S.C. § 1153(b)(5)(C)(i).  For purposes of summary judgment, Plaintiff does not dispute the

8   government's position that this authority was transferred from the Attorney General to the

9   Secretary of Homeland Security.  (Dkt. No. 43 at 5.)

10   In promulgating the Final Rule, the government cited as legal authority, among other

11   things, the statute that created the EB-5 Program.  *See* 84 Fed. Reg. 35,750 (July 24, 2019) (citing

12   8 U.S.C. § 1153).  Further, the Final Rule reiterates the statute's language regarding who is

13   authorized to alter the investment amount:

14   In 1990, Congress set the minimum investment amount for the
     program at $1 million and ***authorized the Attorney General (now the***
15   ***Secretary of Homeland Security) to increase the minimum***
     ***investment amount***, in consultation with the Secretaries of State and
16   Labor.  INA section 203(b)(5)(C)(i), 8 U.S.C. 1153(b)(5)(C)(i).

17   84 FR 35,750, at 35762 (emphasis added).  Given that it was not a lawful Acting Secretary who

18   specified the amount of capital required under the Final Rule (McAleenan), the question is

19   whether the Final Rule is valid.  For this, the Court turns to the FVRA.

20   As noted *supra*, under the FVRA's vacant-office provision, if a person is not lawfully

21   serving in conformity with the FVRA, "[a]n action taken" by that person "in the performance of

22   any function or duty of [the] vacant office ... shall have no force or effect" and "may not be

23   ratified."  5 U.S.C. § 3348(d)(1)–(2) (emphasis added); *but cf. id*. § 3348(e) (exempting certain

24   offices not at issue here).  The phrase "function or duty," in turn, is defined as follows:

25   (2) the term "function or duty" means any function or duty of the applicable office that—

26   (A)     (i) is established by statute; and

27   (ii) is required by statute to be performed by the applicable officer (and only
            that officer).

28   5 U.S.C. § 3348(a)(2)(A).

9

As a threshold matter, there can be no dispute that prescribing a regulation to increase the investment amount in accordance with Section 1153(b)(5)(C)(i) constitutes a "function or duty" of the Secretary of Homeland Security.  The government instead insists that the statutory power to prescribe a regulation that increases the investment amount for the EB-5 Program is not a "function or duty" within the meaning of the FVRA because it is not a function or duty *exclusively* assigned to the Secretary of Homeland Security.  That is, because Section 1153 does not say "the Attorney General and *only* the Attorney General may prescribe regulations" increasing the EB-5 investment amount, it is not a duty or function within the meaning of the FVRA.  *See* 5 U.S.C. § 3348(a)(2)(A) (defining a "duty or function" as being "required by statute to be performed by the applicable officer (and only that officer)").

The Court is unpersuaded.  The EB-5 program statute—Section 1153(b)(5)(C)(i) —states that **"[t]he Attorney General**, in consultation with the Secretary of Labor and the Secretary of State, may from time to time prescribe regulations increasing the dollar amount specified under the previous sentence."  *Id.* (emphasis added).  That the statute does not use the word "only" is immaterial—it provides that the Attorney General can specify the amount and does not identify any other official who can do so; in other words, it identifies the Attorney General and only the Attorney General.  "If the language [of the statute] has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there."  *See CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) (internal citation omitted).  The language of Section 1153 is clear and unambiguous and falls squarely within the definition of "function or duty" under the FVRA.  5 U.S.C. § 3348(a)(2)(A(ii) ("any function or duty of the applicable office that… is required by statute to be performed by the applicable officer").

The government's insistence that the Secretary of Homeland Security's ability to delegate functions, including the function of increasing the required EB-5 program investment amount, means that increasing the investment amount is not a "function or duty" within the meaning of the FVRA is no more availing.  The government observes that the Homeland Security Act allows the Secretary of Homeland Security to delegate "any" function.  *See* 6 U.S.C. § 112(b)(1) (specifying that the Secretary of Homeland Security "may delegate any of the Secretary's functions to any

10

1   officer, employee, or organizational unit of the Department.").  Under the government's theory,

2   because all of the Secretary's functions are delegable, none qualify as a duty or function under the

3   FVRA because the ability to be delegated means that each is not required by statute to be

4   performed *only* by that officer.

5         The government's "approach would require us to ignore the provision's plain language—a

6   cardinal sin of statutory interpretation."  *United States v. Pocklington*, 792 F.3d 1036, 1041 (9th

7   Cir. 2015).  Section 1153 falls squarely within the plain language of the FVRA's definition of

8   function or duty—a statute that designates one officer and only that officer to perform the duty or

9   function.  The FVRA does not define function or duty as required by "a statute that designates one

10  officer to perform a *non-delegable* duty or function." 5 U.S.C. § 3348(a)(2)(A).  It also refers to a

11  "statute" in the singular which means we look only at Section 1153.  *Id.*  The government, in

12  contrast, urges the Court to look at a second, additional statute—the statute providing that the

13  Secretary's functions are delegable.  The FVRA's unambiguous language does not support that

14  interpretative exercise.

15        Further, as one district court has noted regarding this precise issue, "Defendants'

16  construction of the vacant-office provision is at odds with the statutory purpose of the FVRA."

17  *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 34 (D.D.C. 2020), judgment entered, No. CV 19-2676

18  (RDM), 2020 WL 1905063 (D.D.C. Apr. 16, 2020), *appeal dismissed*, No. 20-5141, 2020 WL

19  5358686 (D.C. Cir. Aug. 25, 2020).  Nearly every cabinet-level department has a version of a

20  vesting statute like Section 112(b)(1). *Id.*

21          It was the pervasive use of those vesting-and-delegation statutes,
    along with 'the lack of an effective enforcement process,' that

22  convinced Congress of the need to enact the FVRA. Senate Report at
    7. Yet, if Defendants were correct that the mere existence of these

23  vesting-and-delegation statutes (and the absence of an express
    statutory bar on vesting and delegating a specific function or duty)

24  were sufficient to negate the enforcement mechanisms Congress
    included in the FVRA, Congress would have done little "to restore

25  [the] constitutionally mandated procedures that must be satisfied
    before acting officials may serve in positions that require Senate

26  confirmation." Senate Report at 8; *see also U.S. Telecom Ass'n v.
    FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates

27  authority to a federal officer or agency, subdelegation to a subordinate
    federal officer or agency is presumptively permissible absent

28  affirmative evidence of a contrary congressional intent.").

United States District Court
Northern District of California

*Id.* Congress enacted the FVRA to "recla[im its] Appointments Clause power" *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 70 (D.C. Cir. 2015), "in the face of the long-standing Department of Justice 'position that, in many instances, the head of an executive agency had independent authority apart from the Vacancies Act to temporarily fill vacant offices,'" *L.M.-M.*, 442 F. Supp. 3d at 29 (quoting *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017)). "Congress was concerned, most notably, that the Attorney General and other department heads had made frequent use of organic vesting and delegation statutes to assign the duties of PAS offices to officers and employees, with little or no check from Congress." *L.M.-M.*, 442 F. Supp. 3d at 29. Under the government's interpretative theory, the FVRA did not address these concerns. The Court is not persuaded that the FVRA is so weak.

The government's lament at oral argument that Congress also recognized that the government cannot come to a halt when there is not a Senate confirmed officer to perform a function or duty and thus has allowed the Secretary of Homeland Security (and other cabinet-level secretaries) to delegate functions is not well-taken. If Secretary Nielsen had amended the proper order of succession there would be no issue here; the problem arises because she did not do so and as a result, Mr. McAleenan was not lawfully serving as the Acting Secretary of Homeland Security. If the individual who was actually next in line on the Order of Succession had signed the Final Rule, Plaintiff would not have a claim. But that is not what happened.

### 2) The 2003 Delegation Does Not Apply

Next, the government argues that the Secretary in fact delegated the authority to prescribe the Final Rule at issue here. In particular, the government relies on a 2003 Delegation to Deputy Secretary by then Homeland Security Secretary Tom Ridge ("the 2003 Delegation"). (Dkt. No. 39-1.) In the 2003 Delegation, Secretary Ridge delegated certain delineated responsibilities including "Acting for the Secretary to sign, approve, or disapprove any proposed or final rule, regulation or related document" to the Deputy Secretary of Homeland Security. (*Id*. at Sec. II.G.) This delegation, however, does not apply as there was no Deputy Secretary of Homeland Security for which the authority to sign the Final Rule could be delegated. Indeed, the vacancy in the Deputy Secretary position is what led to the purported appointment of Mr. McAllenan's—the

12

1    Customs and Border Protection Commissioner—as *Secretary* of Homeland Security.

2           For this reason, among others, *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr.*

3    *Servs. ("NWIRP")*, 496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL

4    161666 (D.C. Cir. Jan. 12, 2021), is not persuasive.  The *NWIRP* court never grappled with the

5    fact that the 2003 delegation (assuming it was still in effect in 2019) delegated certain authority to

6    the Deputy Secretary.  Further, the *NWIRP* court relied on an interpretation of 5 U.S.C.

7    3348(a)(2)(B), applying to functions or duties created by *regulation*.  Here, in contrast, Section

8    3348(a)(2)(A)—applying to functions and duties created by *statute*—applies.  And, in any event,

9    the *NWIRP* court never reconciled its apparent interpretation of the FVRA as not applying to

10   delegable functions with the FVRA's plain language.

11                                                    \*\*\*

12          Accordingly, because Section 1153(b)(5)(C)(i) provides that "[t]he Attorney General, in

13   consultation with the Secretary of Labor and the Secretary of State, may from time to time

14   prescribe regulations increasing the dollar amount specified under the previous sentence," *see* 8

15   U.S.C.A. § 1153(b)(5)(C)(i), and when McAleenan  promulgated the Final Rule in July 2019, he

16   was not in fact the Secretary of Homeland Security, his actions have no "force or effect."  *See* 5

17   U.S.C. § 3348(d)(1) ("[a]n action taken" by that person "in the performance of any function or

18   duty of [the] vacant office ... shall have no force or effect").

19   **C.    Ratification**

20          The government next argues that even if McAleenan's approval of the Final Rule has no

21   force or effect, current (and lawfully Senate confirmed) Secretary of Homeland Security

22   Mayorkas' ratification of the Final Rule in March of this year cures any defect arising from Mr.

23   McAleenan's improper appointment.  The government's argument is foreclosed by the FVRA's

24   plain and unambiguous language: "An action that has no force or effect under paragraph (1) may

25   not be ratified."  5 U.S.C. § 3348(d)(2); *see also* 5 U.S.C. § 551(5) ("actions" include "rule

26   making").  The government's heavy reliance on *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d

27   1179, 1190-92 (9th Cir. 2016), is misplaced as it was not a FVRA case and thus did not address

28   the unequivocal languate prohibiting ratification.  The government's reliance on *Guedes v. Bureau*

United States District Court
Northern District of California

1    *of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 12 (D.C. Cir. 2019), *judgment entered*,

2    762 F. App'x 7 (D.C. Cir. 2019), *and cert. denied*, 140 S. Ct. 789 (2020), is similarly misplaced as

3    there the plaintiff did not contest the validity of Attorney General Barr's ratification. *Id.* at 12

4    ("We need not wade into that thicket…Codrea accepts the validity of Attorney General Barr's

5    ratification as to both his statutory and his Appointments Clause claims (citing 5 U.S.C. §

6    3348(d)(1)–(2) (only prohibiting the ratification of nondelegable duties); 28 U.S.C. § 510

7    (authorizing delegation of "any function of the Attorney General")).

8        "[W]hen the statute's language is plain, the sole function of the courts—at least where the

9    disposition required by the text is not absurd—is to enforce it according to its terms*." Hartford*

10   *Underwriters Ins. Co. v. Union Planters Bank, N.A*., 530 U.S. 1, 6 (2000) (internal citation

11   omitted).  The FVRA plainly states that actions taken without authority cannot be ratified.

12   **C. De Facto Officer Doctrine**

13       At the March 25, 2021 hearing, the government requested the opportunity to submit

14   additional briefing regarding whether the common law de facto officer doctrine applies to salvage

15   the Final Rule.   "The oft-forgotten doctrine has 'feudal origins,' dating back to the 15th century."

16   *SW Gen., Inc. v. N.L.R.B*., 796 F.3d 67, 81 (D.C. Cir. 2015), aff'd, 137 S. Ct. 929 (2017) (internal

17   citation omitted).  "The de facto officer doctrine 'confers validity upon acts performed by a person

18   acting under the color of official title even though it is later discovered that the legality of that

19   person's appointment or election to office is deficient.'"  *Hooks v. Kitsap Tenant Support Servs.,*

20   *Inc*., 816 F.3d 550, 564 n.13 (9th Cir. 2016) (quoting *Nguyen v. United States*, 539 U.S. 69, 77

21   (2003)).

22   The Ninth Circuit has noted that "[t]he continued vitality of the de facto officer doctrine is in

23   serious doubt." *Silver v. U.S. Postal Serv*., 951 F.2d 1033, 1036, n. 2 (9th Cir. 1991).

24       The Court has reviewed and considered the parties' additional briefing regarding the de

25   facto officer doctrine and concludes that the government's argument is unavailing.  (Dkt. Nos. 21,

26   35, 38.)  The government's reliance on *Hooks* and *SW Gen., Inc*., is misplaced as both involved

27   vacancies in the positions of General Counsel to the National Labor Relations Board which is

28   explicitly exempted from FVRA Section 3348(d)(1).  No such exemption exists for the Secretary

United States District Court
Northern District of California

1   of Homeland Security.  The FVRA renders actions taken by persons serving in violation of the Act

2   void *ab initio*.  *SW Gen., Inc.*, 796 F.3d at 70-71 (citing 5 U.S.C. § 3348 (d)(1)-(2) ("An action

3   taken by any person who is not acting [in compliance with the FVRA] shall have no force or

4   effect" and "may not be ratified.")).  Under these circumstances, the de facto officer doctrine

5   cannot save the day.

6   **D. Remedy**

7           As a remedy for the FVRA violation, Plaintiff seeks (1) a declaratory judgment that the

8   Final Rule is without force and effect, and (2) an injunction barring Secretary Mayorkas from

9   reinstating the rule absent compliance with the APA's rule-making process.  The government

10  counters that the proper remedy is at most to set aside the part of the rule that is procedurally

11  defective and remand it to agency for consideration.  The government also suggests that the Court

12  could remand without vacatur and that it should do so because (1) vacating the rule would be

13  extremely disruptive, and (2) Secretary Mayorkas has ratified the rule which signals that any

14  defects "are at best technical deficiencies."  (Dkt. No. 39 at 15.)  However, if the Court enters any

15  kind of vacatur order, the government requests a stay to allow the agency time to address the issue.

16          Because the Final Rule "ha[s] no force or effect," 5 U.S.C. § 3348(d)(1), it must be "set

17  aside" as action taken "in excess of statutory ... authority," 5 U.S.C. § 706.  "Ordinarily when a

18  regulation is not promulgated in compliance with the APA, the regulation is invalid." *Idaho Farm*

19  *Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *see also Sierra Club v. Van*

20  *Antwerp,* 719 F. Supp. 2d 77, 78 (D. D.C. 2010) (reiterating "remand, along with vacatur, is the

21  presumptively appropriate remedy for a violation of the APA.").  In the Ninth Circuit, remand

22  without vacatur is the exception rather than the rule. *See California Cmty. Against Toxics v. U.S.*

23  *EPA*, 688 F.3d 989, 994 (9th Cir. 2012) ( "we have only ordered remand without vacatur in

24  limited circumstances."); *Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In

25  rare circumstances, when we deem it advisable that the agency action remain in force until the

26  action can be reconsidered or replaced, we will remand without vacating the agency's action.").

27          Here, while there would certainly be some disruption if the Rule is vacated given the

28  length of time the Rule has been in effect, the government has made no specific showing of harm

United States District Court
Northern District of California

United States District Court
Northern District of California

1    beyond asserting that it would be "extraordinarily disruptive." (Dkt. No. 39 at 14.) *See Ctr. for*

2    *Food Safety v. Vilsack*, 734 F.Supp.2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only

3    found remand without vacatur warranted by equity concerns in limited circumstances, namely

4    serious irreparable environmental injury."). Remand with vacatur—the default remedy for a rule

5    that lacks the force of law—is thus appropriate here.

6        With respect to Plaintiff's request for an injunction,  as the court in *L.L.-M*. noted when

7    considering the proper remedy there for the FVRA violation, "the Supreme Court has cautioned

8    that a district court vacating an agency action under the APA should not issue an injunction unless

9    doing so would 'have [a] meaningful practical effect independent of [the policy's] vacatur.'"

10   *L.M.-M*., 442 F. Supp. 3d at 36 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165

11   (2010)) (alterations in original).  This caution is warranted because "[a]n injunction is a drastic and

12   extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic

13   remedy ... [is] sufficient to redress" the plaintiffs' injury. *Monsanto Co*., 561 U.S. at 165.  Plaintiff

14   contends the "BRC may continue to find investors are hesitant to participate in the EB-5 Program

15   even though the new Rule has been set aside and the old rule is still in effect" such that it "will not

16   obtain the full range of investors." (Dkt. No. 38 at 20.)  This unadorned argument insufficient to

17   justify the extraordinary remedy of an injunction and fails to demonstrate that remand and vacatur

18   is an insufficient remedy here.

19       Accordingly, the Court sets aside the Final Rule and remands the matter to the Agency.[4]

20   The Court declines to address the government's one-sentence request for a stay which was only

21   raised in a footnote in its brief.  (Dkt. No. 39 at 15 n.9.)

22                                   **CONCLUSION**

23       For the reasons stated above, Plaintiff's cross-motion for summary judgment on its fourth

24   claim is GRANTED.  The Final Rule is VACATED and the matter is REMANDED to the Agency

25   for further action.

26       As vacating the Rule moots Plaintiff's remaining causes of action, they are dismissed

27

28   ---
     [4] Having concluded that Plaintiff is entitled to remand on this claim, it is unnecessary to consider
     Plaintiff's other claims for relief and Plaintiff's motion for a preliminary injunction is moot.

1   without prejudice.  Separate judgment will be entered in Plaintiff's favor.

2

3   **IT IS SO ORDERED.**

4   Dated: June 22, 2021

5

6   _____

7   JACQUELINE SCOTT CORLEY
    United States Magistrate Judge

8

United States District Court
Northern District of California